UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JANE M. KIRK, | CASE NO.    C07-5459RBL-KLS |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | Noted for June 27, 2008 |
| Defendant. | |

Plaintiff, Jane M. Kirk, has brought this matter for judicial review of the denial of her application for disability insurance benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Ronald B. Leighton's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 46 years old.[1] Tr. 44.  She has a high school education and past work experience as a medical assistant. Tr. 31, 255.

On August 17, 2004, plaintiff filed an application for disability insurance benefits, alleging

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

disability as of July 17, 2004, due to swollen legs, lymphedema and sleep apnea. Tr. 24, 27, 60-62.  Her

application was denied initially and on reconsideration. Tr. 44-45, 48, 52.  A hearing was held before an

administrative law judge ("ALJ") on December 11, 2206, at which plaintiff, represented by counsel,

appeared and testified, as did a medical expert and a vocational expert. Tr. 252-79.

On January 24, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding

specifically in relevant part:

> (1)  at step one of the sequential disability evaluation process,[2] plaintiff had not
> engaged in substantial gainful activity since her alleged onset date of disability;
>
> (2)  at step two, plaintiff had "severe" impairments consisting of lymphedema and
> sleep apnea;
>
> (3)  at step three, none of plaintiff's impairments met or equaled the criteria of any
> of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> (4)  at step four, plaintiff had the residual functional capacity to perform a modified
> range of sedentary work, which precluded her from performing her past relevant
> work; and
>
> (5)  at step five, plaintiff was capable of performing other jobs existing in significant
> numbers in the national economy.

Tr. 24-32.  Plaintiff's request for review was denied by the Appeals Council on June 27, 2007, making the

ALJ's decision the Commissioner's final decision. Tr. 8; 20 C.F.R. § 404.981.

On August 30, 2007,[3] plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

(Dkt. #1-#3).  The administrative record was filed with the Court on December 10, 2007. (Dkt. #10).

Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in

the alternative, for further administrative proceedings for the following reasons:

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

[3]As indicated herein, plaintiff's complaint was filed more than sixty days after the Appeals Council denied plaintiff's request for review.  A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 (claimant may file action in federal court within 60 days after the date notice of the Appeals Council's action is received); 20 C.F.R. § 404.982 (any party to Appeals Council's decision or denial of review may request time for filing action in federal court be extended).  This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." Banta v. Sullivan, 925 F.2d 343, 345 (9th Cir. 1991).  As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." Vernon v. Heckler, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)).  Because the Commissioner failed to raise the statute of limitations as an affirmative defense in her responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in assessing plaintiff's credibility;

(c)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(d)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.     <u>The ALJ's Evaluation of the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." <u>Id.</u> at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725. The ALJ can do this "by setting out a

1   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

2   thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the

3   evidence." Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

4   from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

5       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

6   either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

7   treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

8   and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However,

9   the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler,

10  739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

11  explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d

12  700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

13      In general, more weight is given to a treating physician's opinion than to the opinions of those who

14  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

15  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

16  or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190,

17  1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242

18  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

19  opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion

20  may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id.

21  at 830-31; Tonapetyan, 242 F.3d at 1149.

22      A.   Ms. Bell

23      In early December 2006, Kelly M. Bell, a registered nurse who had been plaintiff's primary

24  treating source for her chronic pain since mid-August 2005, answered a number of questions set forth on a

25  form provided by plaintiff's counsel regarding plaintiff's impairments and limitations. Tr. 29, 245-47.  Ms.

26  Bell checked a box indicating that she agreed that plaintiff's medical conditions included lymphedema,

27  chronic venous insufficiency, hypertension, and sleep apnea. Tr. 245.  Ms. Bell stated, however, that

28  plaintiff's primary problem was her lymphedema, which was not "curable" or "responsive to therapy." Id.

1   Symptoms included chronic leg pain when plaintiff's legs were not elevated. Id.

2        Ms. Bell further stated that it was necessary for plaintiff to raise her legs "[m]ost of the time," and

3   that she was limited to lifting and carrying less than 10 pounds occasionally and frequently, standing less

4   than two hours in an eight-hour workday, and sitting about two hours in an eight-hour workday if her feet

5   were elevated. Tr. 246.  In addition, Ms. Bell stated that it was medically necessary for plaintiff to lie

6   down during the day for "[m]ost of the day," and that even when plaintiff's pain is "treated," her

7   lymphedema "is not curable." Id.  In Ms. Bell's opinion, plaintiff also was limited in her ability to use her

8   lower extremities and severely limited in her ability to engage in most postural activities. Id.

9        In terms of the amount of time plaintiff would miss work, Ms. Bell indicated this would be more

10  than two days a month. Tr. 247.  In support of that opinion, Ms. Bell stated that she knew of no sedentary

11  job that would allow "a person to lay down with legs elevated." Id.  Ms. Bell felt that the use of diuretics

12  for treating plaintiff's condition was "ineffective", that plaintiff had experienced a 50 pound weight gain

13  due in part to the side effects of her medication, and that plaintiff's medication also had resulted in a mild

14  impact on her concentration, persistence or pace. Id.

15       The ALJ gave "little weight" to Ms. Bell's opinion that plaintiff's impairments had resulted in an

16  "inability to perform even sedentary work for a full eight hours per day." Tr. 29.  The first reason the ALJ

17  gave for discounting that opinion was that her statements were provided in answer to written questions she

18  had completed at the request of plaintiff's attorney. Id.  The ALJ set forth the following additional specific

19  reasons for not adopting Ms. Bell's statements and opinion:

20      . . . While Nurse Bell has been the claimant's primary treating source for her chronic
        pain since August 12, 2005, her report that the claimant has had poor response to
21      therapy is inconsistent with the evidence of record suggesting that the claimant's pain is
        relieved with prescribed medication in addition to the testimony of the claimant that her
22      leg pain when standing is reduced by wearing support hose.  In addition, she failed to
        note that the claimant has not been fully compliant in wearing her support hose.  Her
23      opinion that it is medically necessary for the claimant to lie down for most of the day
        based on her report that even if the claimant's pain is treated the lymphedema is not
24      curable is given little weight.  Her report that diuretics had been ineffective is
        inconsistent with medical records which reveal the claimant's leg swelling decreased
25      with prescribed Lasix in July 2004.  In addition, [the medical expert] Dr. [David]
        Rullman's testimony [at the hearing] indicated he was puzzled by treatment records
26      which fail to consistently document the claimant's weight.  He expressed wonder that a
        conclusion could be reached regarding the efficacy of treatment with diuretics without
27      consideration of change in weight.  In addition, Nurse Bell reported that the claimant's
        inactivity had resulted in a 50-pound weight gain which can be expected to exacerbate
28      her condition and is consistent with the claimant's testimony that her condition is worse
        now than when she was working.  While this can be interpreted as evidence supportive

of disability, an equally legitimate interpretation is that her condition might actually improve with increased activity. Finally, her opinion that the claimant would likely miss more than two days of work per month from even a sedentary job is given little weight. She reported her conclusion was based on her report that she was unaware of any sedentary job which would allow an individual to lie down with her leg elevated. Nurse Bell's opinion regarding jobs is out of the area of her expertise as a nurse practitioner.

It is also noted that treatment records from Nurse Bell dated December 8, 2004, include a notation of "Lymphedema – totally disabled" and that the claimant was advised to "seek social security disability". However, that opinion is given little weight as she reported the claimant's lympth angiogram was negative and described no functional limitations associated with lymphedema to warrant a conclusion that the condition was disabling (Exhibit 4F/95) [Tr. 194].

Tr. 29-30.

Plaintiff challenges the ALJ's findings here, arguing first that the fact that Ms. Bell's statements were written on a questionaire provided by her counsel was an improper basis upon which to reject those statements. The undersigned agrees. Absent "evidence of actual improprieties," the purpose for which a medical report is obtained is not a legitimate basis for rejecting it. See Lester, 81 F.3d at 832 (examining doctor's findings entitled to no less weight when examination is procured by claimant than when obtained by Commissioner). Here, while some questions on the questionaire may have been somewhat leading – though that fact too, as pointed out by plaintiff, in itself is not a sufficient basis upon which to discount a medical opinion – there is no indication, let alone evidence, of actual improprieties on the part of plaintiff or her counsel in the record. See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (faulting ALJ for rejecting physician's uncontroverted and corroborated opinions because they were given in response to leading, hypothetical questions). Thus, the reason put forth by the ALJ here was not a valid reason for rejecting Ms. Bell's opinion.

Next, plaintiff contests the ALJ's finding that Ms. Bell's statement that she had a poor response to therapy was inconsistent with evidence in the record that her pain was relieved by prescribed medication, and with her testimony that wearing support hose reduced her leg pain when standing. The undersigned, however, finds no error here. First, the weight of the evidence in the record reveals that plaintiff obtained significant relief on prescribed medication. For example, on August 9, 2005, plaintiff reported that "[f]or the past couple of months," she had been on Oxycotin, which had "given her good pain control." Tr. 218. While plaintiff reported that her medications did "not seem to work well" three days later (Tr. 242), on December 22, 2005, plaintiff declined to switch to a cheaper medication, because she knew the Oxycotin

worked "well for her despite the costs issues" (Tr. 232).

Indeed, on January 17, 2006, Ms. Bell noted that plaintiff "looked pretty good," further stating that "no changes" were needed with respect to he medication refills. Tr. 231.  On April 3, 2006, plaintiff again declined to switch to a lower cost medication, because she did not want to change from what had "worked for her for the last couple of years." Tr. 229.  On May 22, 2006, plaintiff was noted to be "tolerating the dosing just fine." Tr. 228.  Plaintiff argues that there is no evidence in the record that her medications have relieved all of her pain.  While perhaps true, as set forth above, the weight of the evidence does reveal that plaintiff largely has achieved "good pain control" thereon, thereby indicating that her chronic pain is not at a level that is disabling in nature.

In terms of the use of support hose, here too the undersigned finds the ALJ did not err.  Plaintiff argues Ms. Bell's report of plaintiff's poor therapy response is not inconsistent with the medical record, because she merely is providing a report of plaintiff's complaints, and plaintiff consistently has reported the need to elevate her legs as the primary method of reducing her pain and swelling.  Ms. Bell, however, was plaintiff's primary treating source for her chronic pain, and thus would be expected to have at least some sense of plaintiff's therapy response based in part on their treatment relationship, and the effect that response would have on her ability to function.  The record also reveals that Ms. Bell was well aware of plaintiff's good response to her pain medication, as indicated above, which is very much inconsistent with the allegation that plaintiff's primary method of reducing pain came from leg elevation.

Ms. Bell's poor therapy response report, furthermore, is inconsistent with both the medical record and plaintiff's own statements regarding relief she received from use of support hose.  For example, on February 19, 2004, plaintiff reported that"[l]ast November she noticed edema of her lower extremities and fitted herself with support hose, which" had "markedly improved the dependent edema." Tr. 136.  Indeed, treatment notes from that time period reveal a decrease in plaintiff's edema and reports of feeling "better". See Tr. 138, 142, 144.  In addition, as noted by the ALJ, plaintiff testified at the hearing that when she did wear the support hose it helped with the pain when standing. Tr. 268.  Given this evidence, the ALJ also was not remiss in discounting Ms. Bell's statements and opinion on the basis that she failed to note in her answers to the questions posed by plaintiff's counsel that plaintiff had not been fully compliant in her use of the support hose, though she was well aware of this. See Tr. 229, 232, 235, 273.

Plaintiff argues the presence in the record of a single report that a supplement had reduced her

swelling in July 2004, does not contradict Ms. Bell's opinion in 2005, that diuretics were ineffective.  But, as noted by the ALJ, Dr. Rullman, the medical expert, testified that because there was "not a single weight recorded," how could anyone "judge how effective diuretics might be without the help of scales and seeing what happens with" plaintiff's edema. Tr. 272.  Thus, the ALJ appropriately questioned the basis for Ms. Bell's opinion on this issue given Dr. Rullman's testimony.  In addition, to the extent the effect of diuretics on plaintiff's is reflected in the record, that effect shows a reduction in weight, even though there may have been only evidence of one occurrence of such. See id.

Plaintiff further argues the ALJ erred in questioning Ms. Bell's opinion regarding her alleged need to lie down for most of the day, given that no other medical source in the record had questioned that need. While true, this does not necessarily mean that opinion is well supported.  As pointed out by the ALJ, the reason Ms. Bell gave for her opinion that plaintiff needed to lie down for most of the day was medically necessary, was because even if her pain is treated, the lymphedema itself is not curable. Tr. 246. Assuming this to be the case, Ms. Bell still failed to explain why the impairment itself would result in significant limitations if the pain could be treated successfully.  While the ALJ did not specifically state this reasoning in so many words, his discussion of this particular issue in the context of his notation that plaintiff received substantial pain relief on medication creates that inference.

The undersigned does agree with plaintiff though that the ALJ's statement that plaintiff's condition might actually improve with increased activity is not a valid basis for rejecting Ms. Bell's opinion.  While such an interpretation may well be an equally legitimate reading of the medical evidence, the ALJ points to nothing in the record to show that increased activity would be effective, or, as noted by plaintiff, that her treatment providers have recommended an increase therein.  As such, the undersigned is inclined to view the ALJ's statement here as an improper substitution of his own lay opinion for that of a medical source opinion. See Gonzalez Perez v. Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own opinion for findings and opinion of physician); McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 799 (2nd Cir. 1983) (ALJ cannot arbitrarily substitute own judgment for competent medical opinion); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978) (ALJ not free to set own expertise against that of physician who testified before him).

Nevertheless, given the other valid reasons for rejecting Ms. Bell's findings and opinion discussed

1    herein, the ALJ's overall determination here was proper.  In addition to the above reasons, for example, the

2    ALJ correctly gave little weight to Ms. Bell's opinion that plaintiff would likely miss more than two days

3    of work per month from even a sedentary job based on her statement that she was unaware of any

4    sedentary job which would allow an individual to lie down with her leg elevated.  As noted by the ALJ,

5    her opinion regarding the availability of jobs is out of the area of her expertise as a nurse practitioner.

6            Plaintiff also challenges the ALJ's statement that he was giving little weight to Ms. Bell's early

7    December 2004 opinion that plaintiff was "totally disabled" because of her lymphedema, due to the fact

8    that Ms. Bell reported a negative electrodiagnostic study concerning that condition and found no

9    functional limitations associated with it.  Plaintiff argues these reasons are not valid, because the primary

10   function of medical records is to promote communication and record keeping for health care personnel,

11   and not to provide evidence for disability determinations.  While true, it is well accepted that an ALJ need

12   not accept a medical opinion that is "brief, conclusory, and inadequately supported by clinical findings" or

13   "by the record as a whole." Batson, 359 F.3d at 1195; Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at

14   1149.  Such is the case with the particular opinion here, which contains little, if any, objective findings to

15   support a conclusion of total disability. See Tr. 194.

16           Lastly, plaintiff asserts that Ms. Bell's opinion regarding plaintiff's disability is consistent with the

17   disability opinions of Ralph L. Burke, M.D. See Tr. 212-13.  As discussed below, however, the ALJ also

18   did not err in rejecting the opinions of Dr. Burke.  Thus, regardless of the extent to which the opinions of

19   Ms. Bell and those of Dr. Burke are consistent, the findings of the ALJ were proper.

20           B.    Dr. Smythe

21           In early December 2006, Melanie J. Smythe, D.O., like Ms. Bell, answered a number of questions

22   set forth on a form provided by plaintiff's counsel regarding plaintiff's impairments and limitations. Tr.

23   249-51.  On that form, Dr. Smythe stated that she had only seen plaintiff for two visits, one on August 9,

24   2005, and the other on October 18, 2005. Tr. 249.  Dr. Smythe further stated that all of her answers were

25   based on plaintiff's condition as it existed at the time of the last visit, and thus might "not be accurate as of

26   now." Tr. 249, 251.  As with Ms. Bell, Dr. Smythe agreed plaintiff suffered from lymphedema, chronic

27   venous insufficiency, hypertension, and sleep apnea. Tr. 249.  In addition, Dr. Smythe opined that plaintiff

28   suffered from chronic pain as well. Id.

1    In answer the question as to what symptoms plaintiff experienced as a result of her impairments,

2  Dr. Smythe stated that she was unable to give an opinion because it had been greater than one year since

3  plaintiff had last been seen. Id.  Dr. Smythe stated that while it was necessary for plaintiff to elevate her

4  feet above her heart during the day at her last visit, she was unsure how long she was required to do so at

5  the time of the questionaire, as again it had been greater than one year since she was last seen. Tr. 250.  At

6  that time, though, Dr. Smythe opined that plaintiff would be able to lift and carry less than 10 pounds both

7  occasionally and frequently, stand and walk for a total of less than two hours in an eight-hour workday, sit

8  for a total of less than six hours in an eight-hour workday, and significantly limited in her ability to

9  perform a number of postural activities. Id.

10    Unlike Ms. Bell, however, Dr. Smythe did not know if plaintiff would be expected to miss more

11  than two days a month from even a sedentary job or what side effects she might have from her

12  medications. Tr. 251.  Nevertheless, Dr. Smythe opined that plaintiff's concentration, persistence or pace

13  would be moderately affected by her impairments, medications and their side effects, though, once more,

14  she noted that given the amount of time that had passed, her answer might not be currently accurate. Id.

15    Here too, the ALJ gave "little weight" to Dr. Smythe's opinion that plaintiff's impairments had

16  resulted in an "inability to perform even sedentary work for a full eight hours per day," in part because her

17  statements regarding plaintiff's condition and symptoms were provided in answer to written questions she

18  had completed at the request of plaintiff's attorney. Tr. 29.  As discussed above with respect to the findings

19  and opinions of Ms. Bell, however, this is not a valid reason for discounting Dr. Smythe's opinion.  That

20  is, absent evidence of actual improprieties, the purpose for which a medical report is obtained does not

21  present a legitimate basis for rejecting it. See Lester, 81 F.3d at 832.

22    The ALJ then went on to provide the following additional reasons for rejecting Dr. Smythe's

23  findings and opinion:

24      Dr. Smythe's opinion is also entitled to little weight.  She has acknowledged that the
       limitations she described for the claimant are based on her condition at her last visit on
25      October 18, 2005, greater than one year ago, and those limitations might not be
       accurate now.  Dr. Smythe further acknowledged that she had otherwise seen the
26      claimant on only one other occasion in August 2005 and that she is unable to describe
       the claimant's current symptoms on any side effects she experiences from her
27      medications.  In addition, her opinion that side effects of prescribed narcotic
       medication result in a moderate limitation in her concentration, persistence, and pace
28      are inconsistent with the opinion of Kelly M. Bell, ARNP, that the claimant would have
       only a mild limitation in that area.  In that regard, Nurse Bell's opinion is given greater

weight as the claimant's current treating practitioner.  Although Nurse Bell reported she would expect the claimant to require increased medication if she were unable to lie down a significant portion of the day, she is opioid-tolerant and "experiences minimal side effects" (Exhibit 10F/140).

Tr. 30.  Plaintiff argues these reasons are not sufficient to reject the findings and opinions of Dr. Smythe. The undersigned agrees.

First, as pointed out by plaintiff, while Dr. Symthe did state that she was not certain of plaintiff's condition at the time she completed the questionaire, she was able to provide opinions regarding plaintiff's symptoms and functioning at the time of the last visit.  Since that visit occurred during the relevant time period at issue here, the ALJ was required to take into account those opinions and treat them as valid evidence of plaintiff's condition at least as of that time.  In addition, while it may be that Dr. Smythe's description of plaintiff's symptoms and functioning might not be accurate as of the time the queationaire was completed, the ALJ pointed to no specific evidence indicating the inaccuracy thereof, except in regard to plaintiff's limitations in concentration, persistence or pace.

With respect to this latter finding – i.e., concerning the limitations in concentration, persistence or pace – the undersigned finds no error on the part of the ALJ here.  Specifically, the ALJ was not remiss in placing greater weight on the mild findings noted by Ms. Bell, given the longer treating relationship she had with plaintiff.  See Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 *5 (noting it may be appropriate to give more weight to opinion of medical source who is not acceptable medical source if he or she has seen individual more often and has provided better supporting evidence and better explanation for his or her opinion).  In addition, Ms. Bell's opinion on this issue hardly can be said to be consistent with that of Dr. Symthe.  While it may be that consistency does not require complete similarity, in general the terms "mild" and "moderate" are treated as being substantially dissimilar.

C.      Dr. Burke

On March 30, 2005, plaintiff was seen by Ralth L. Burke, M.D., who stated in his progress notes for that visit as follows:

**SUBJECTIVE:**      The patient continues to experience significant lower extremity edema which is noted to be idiopathic in nature.  Despite using Jobes stocking as well as water aerobics, she continues to have disabling lower extremity edema for which she is unable to stand for more than an hour or two per day.

It is my opinion that this individual is totally disabled to any sort of gainful employment that would require sitting and/or standing.

REPORT AND RECOMMENDATION
Page - 11

Tr. 213.  In a letter date May 25, 2005, Dr. Burke wrote that plaintiff "suffers from idiopathic lymphedem [sic] and is totally disabled." Tr. 212.

The ALJ provided the following reasons for rejecting these opinions:

> The opinions of Ralph L. Burke, M.D., have also been considered and given little weight.  In March 2005, Dr. Burke reported that the claimant was disabled due to lower extremity edema which had been unresponsive to use of Jobst stockings and water aerobics and resulted in inability to stand for more than one or two hours per day.  He further reported she was "totally disabled to any sort of gainful employment that would require sitting and/or standing.["] (Exhibit 6F/107).  However he did not give any rationale for why the claimant's impairment resulted in such extreme limitations.  The May 25, 2005, opinion of Dr. Burke that the claimant is "totally disabled" due to idiopathic lymphedema has also been considered and given little weight (Exhibit 6F/108).  In that report, Dr. Burke did not report any functional limitations associated with that condition and did not report any objective findings to support his opinion.  In addition, the issue of whether an individual is "disabled" under the Social Security Act is an administrative findings reserved to the Commissioner of the Social Security Administration (Social Security Ruling 96-4p).

Tr. 30.  Plaintiff argues this characterization of Dr. Burke's opinions is incorrect, because he specifically did provide a basis for his opinions.  Those opinions, however, fail to provide any medical rationale for finding plaintiff unable to stand for more than an hour or two a day and to be completely disabled.  Rather, they appear to be based primarily on plaintiff's own subjective report of her limitations and functional capabilities, or lack thereof – which, as discussed in greater detail below, the ALJ properly discounted – and not on any objective findings as noted by the ALJ.  See Tonapetyan, 242 F.3d at 1149 (ALJ may disregard medical opinion premised on claimant's complaints where record supports ALJ in discounting claimant's credibility).

Plaintiff also argues Dr. Burke's opinions regarding her disability are consistent with the disability opinions provided by Ms. Bell and her own testimony concerning her symptoms and limitations.  As just discussed, however, and for the reasons set forth below, the ALJ did not err in determining plaintiff to be not fully credible.  In addition, as discussed above, the ALJ also did not err in rejecting the findings and opinions of Ms. Bell.  Accordingly, again, and because of the other independent reasons the ALJ gave for rejecting them, the ALJ did not err in rejecting the opinions of Dr. Burke, regardless of any consistency they may have with other opinions in the record.  Contrary to plaintiff's assertion, therefore, the ALJ did provide both legitimate and specific reasons for why these opinions were entitled to less weight than the opinions of the state agency consulting non-examining physicians in the record.

1  II.      The ALJ's Assessment of Plaintiff's Credibility

2          Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

3  639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

4  F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

5  based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

6  claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

7  long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148

8  (9th Cir. 2001).

9          To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

10 the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

11 identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

12 Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

13 malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

14 Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v.

15 Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

16         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

17 evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

18 testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

19 also may consider a claimant's work record and observations of physicians and other third parties

20 regarding the nature, onset, duration, and frequency of symptoms. Id.

21         The ALJ found plaintiff's statements concerning the intensity, persistence and limiting effects of

22 her symptoms to be not entirely credible. Tr. 28.  Specifically, the ALJ discounted plaintiff's credibility in

23 relevant part for the following reason:

24         Although the evidence reveals the claimant has been diagnosed with lymphedema and
           sleep apnea which can be expected to result in some pain and limitation, the objective
25         evidence does not fully support her allegations of disabling pain and swelling.  Results
           of testing suggest the claimant's idiopathic leg edema is not related to major venous or
26         lymphatic obstruction.  Medical records do not document congestive heart failure,
           nephrotic syndrome or severe anemia which could be associated with poor response to
27         treatment.

28 Tr. 28.  A determination that a claimant's complaints are "inconsistent with clinical observations" can

satisfy the clear and convincing requirement. <u>Regennitter v. Commissioner of SSA</u>, 166 F.3d 1294, 1297 (9th Cir. 1998).

Plaintiff argues the absence of certain causes for her edema does not mean that it does not actually exist. Although perhaps true, the ALJ's point is not that plaintiff does not have edema, but that the extent of her alleged pain and other symptoms is not supported by the objective medical evidence in the record. Indeed, while the record does reveal diagnoses of edema, resulting in at least some pain and swelling in plaintiff's lower extremities, as the ALJ further noted, "[p]hysical examinations have generally revealed mild to moderate lower extremity edema." <u>See</u> Tr. 108, 111, 117, 119, 121, 123-25, 127, 136-38, 142, 144, 194, 196, 219, 232, 235. Dr. Rullman also pointed out in his testimony that the pain plaintiff had been "attempting to describe," was in his opinion "far out of proportion to any edema that's been commented in the record." Tr. 273.

In addition, the ALJ discounted plaintiff's credibility in part because her edema had "been shown to respond to well-fitted stockings in combination with diuretics." Tr. 28. This is a valid reason for finding a claimant to be not fully credible. <u>See</u> <u>Morgan v. Commissioner of Social Sec. Admin.</u>, 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998). Despite medical "reports from various treating physicians to the contrary," which the ALJ noted, and which, as discussed above, the ALJ properly rejected, the evidence in the record does show plaintiff's edema has responded well when stockings were used. <u>See</u> Tr. 136. Again, Dr. Rullman pointed out that plaintiff got a positive response to diuretics as well. <u>See</u> Tr. 272. In addition, as noted by the ALJ (<u>see</u> Tr. 29), and as discussed above, the record clearly shows plaintiff received much relief as the result of her pain medications.

The ALJ also noted that plaintiff had not been fully compliant with wearing her stockings. Tr. 28. Failure to assert a good reason for not seeking or following a prescribed course of treatment, or a finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain testimony." <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989). As noted above, the record contained evidence plaintiff was able to achieve marked improvement in her edema with her stockings. Tr. 136. In early June 2004, it was noted that she would do best by using such "external support stockings." Tr. 131. In late July 2004, a notation on a progress note stated that plaintiff "[m]ust wear support stocking." Tr. 128. However, at the

1    hearing, Dr. Rullman noted that the record indicated plaintiff really did not wear them. Tr. 273.

2        In late October 2005, Ms. Bell "[e]ncouraged her to wear" her support hose at "all times during the

3    day to keep swelling minimized as much as possible," but noted that plaintiff was not currently wearing

4    them. Tr. 235.  In late December 2005, Ms. Bell again commented that she was not wearing her support

5    hose. Tr. 232.  In early April 2006, Ms. Bell further commented that plaintiff had her stockings "on for a

6    change" (Tr. 229), suggesting, as pointed out by the ALJ, that they usually were not worn by her (Tr. 28).

7    Plaintiff characterizes her failure to wear her support hose as a lapse in judgment, and that while wearing

8    them reduced her pain, they did not reduce the swelling.

9        Again, though, medical evidence in the record shows they had reduced her swelling significantly

10   on at least one occasion.  In addition, the fact that wearing her stockings substantially reduced at least one

11   of her allegedly disabling symptoms alone is sufficient to call plaintiff's credibility into question.  Further,

12   the fact that the record shows plaintiff has been fairly consistent in failing to wear support hose despite the

13   recommendation that she do so to help reduce her symptoms, belies the claim that such failure constituted

14   merely a lapse in judgment.  Accordingly, since the weight of the evidence in the record indicates plaintiff

15   was not fully compliant with this form of recommended treatment, the ALJ did not err in discounting her

16   credibility because of it.

17       The ALJ also noted that plaintiff was advised by Ms. Bell to stop smoking because she could not

18   afford to compromise her circulation. Tr. 28.  Citing to a Seventh Circuit decision criticizing the ALJ for

19   finding the claimant incredible for failing to stop smoking, plaintiff argues this was not a valid basis to

20   discount her credibility.  See Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000) (noting lack of medical

21   evidence establishing link between smoking and claimant's symptoms, and finding it extremely tenuous to

22   infer from failure to give up smoking that claimant lacks credibility regarding seriousness of her condition,

23   given addictive nature of smoking and likelihood that failure to quit could also be attributable to factors

24   unrelated to the effect of smoking on health).  Here, though, a link has been made between smoking and

25   plaintiff's circulation (Tr. 229), and there is no indication in the record that plaintiff has attempted to quit

26   or that other factors have prevented her from doing so.

27       Regardless, even assuming it is inappropriate to discount plaintiff's credibility in this case due to

28   her failure to quit smoking – because of the addictive nature of smoking or potential different reasons for

her failure to quit – as discussed above, the ALJ provided a number of other valid reasons for discounting her credibility.  That is, the mere fact that one reason provided by the ALJ for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence, as it is here. Tonapetyan, 242 F.3d at 1148.

Plaintiff further argues that there is un-refuted testimony in the record that she spends the majority of her time elevating her legs in a hospital bed and has minimal daily activities.  However, as discussed above, the ALJ did properly discount the evidence in the record concerning her alleged need to elevate her legs for the amount of time she alleges.  In addition, while plaintiff may have minimal daily activities, the ALJ did not discount her credibility on this basis.  Indeed, there is no requirement for an ALJ to find a claimant not fully credible with respect to every aspect of the claimant's testimony or in regard to all of the evidence contained in the record.  Rather, the ALJ may take into account a number of factors to make that determination, and properly did so here.

Plaintiff also asserts the ALJ failed to acknowledge the fact that her prescriptions for Oxycotin and Oxycodone indicate Ms. Bell must have believed she was in serious pain, or those medications would not have been prescribed for her.  Although evidence of prescriptions for pain medications may be indicative of the presence of pain, the ALJ did not find plaintiff experienced no pain as the result of her impairments.  Rather, the issue here for credibility purposes is whether those medications caused plaintiff to experience significant improvement in her pain.  As discussed above, the medical and other evidence in the record did show this to be the case, which the ALJ properly relied on to find her not fully credible.

Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

> The claimant's allegations of inability to work due to her impairments is also inconsistent with her report on April 3, 2006, that she was "finally getting unemployment".  In order to qualify for such payments, she was required to sign a statement indicating that she was available for employment.

Tr. 29.  Plaintiff acknowledges that an ALJ may discredit a claimant for receiving unemployment benefits. See Copeland v. Bowen, 861 F.2d 536, 542 (9th Cir. 1988) (noting ALJ gave specific reasons for rejecting claimant's credibility, including his receipt of unemployment benefits, indicating he apparently considered himself capable of work and holding himself out as being available therefor).  Nevertheless, she argues that a desire to return to work does not mean the goal of employment is attainable or negates the presence of disability.  In addition, plaintiff argues that because applicants for Supplemental Security Income

REPORT AND RECOMMENDATION
Page - 16

("SSI") benefits must apply for other benefits for which they might be eligible, including unemployment benefits, and because the definitions of disability under both Social Security benefits programs are the same, equity dictates that an application for disability insurance benefits should not have the fact that he or she filed an application for unemployment benefits used against her.

Plaintiff's argument on this issue, however, is flawed.  As plaintiff herself admits and as noted above, the Ninth Circuit has found the receipt of unemployment benefits is a valid basis for discounting a claimant's credibility.  Further, receipt of such benefits, while not conclusive on the issue of a claimant's ability to attain work, at the very least does seriously call into question plaintiff's allegation here that she is incapable of working.  The fact that a claimant may not be able to obtain a job also is of little relevance, as the determination concerning a claimant's ability to work is based on his or her medically determinable impairments and limitations, regardless of whether or not the claimant ultimately is able to get a job.  See 20 C.F.R. § 404.1566(a).  Finally, 20 C.F.R. § 416.210(a) and 20 C.F.R. § 416.1330 merely set forth the requirement that SSI applicants also apply for other benefits for which they may be eligible, but do not at all indicate that such eligibility is compatible with entitlement to SSI benefits, or that if eligible that fact may not be used to deny receipt of SSI benefits.

III.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

1   evidence." Id. at *7.

2       Here, the ALJ assessed plaintiff with the following residual functional capacity:

3       . . . [T]he claimant has the residual functional capacity to perform no more than
        sedentary work.  She can lift up to 10 pounds at least occasionally.  She can sit for one
4       hour at one time up to six hours of an eight-hour workday.  She can stand 30 minutes.
        She can walk two blocks at one time.  She can climb six stair steps.  Pushing and
5       pulling is limited to such tasks as opening and closing drawers.  She has average
        memory.  Due to pain and fatigue, her ability to maintain concentration and alertness is
6       limited to 90 percent of normal.

7   Tr. 27.  Plaintiff argues the above assessment was improper, because the ALJ failed to assess whether she

8   was capable of working on a regular and continuing basis for eight hours a day, five days a week.  See SSR

9   96-8p, 1996 WL 374184 *2 ("Ordinarily, RFC is the individual's maximum remaining ability to do

10  sustained work activities in an ordinary work setting on a regular and continuing basis [eight hours a day,

11  for five days a week, or an equivalent work schedule], and the RFC assessment must include a discussion

12  of the individual's abilities on that basis.").  Given that there is at least some issue concerning plaintiff's

13  ability to work on this basis in light of the medical evidence in the record – in particular the findings and

14  opinion of Dr. Smythe concerning plaintiff's exertional limitations (see Tr. 250) – the ALJ should have

15  included such an assessment.

16      Plaintiff also argues the ALJ erred by failing to thoroughly address her sleep apnea and depression

17  and how those impairments could effect her ability to perform work activities.  At least with respect to her

18  sleep apnea, the undersigned agrees.  Although the record is largely devoid of evidence of specific work-

19  related limitations resulting from that impairment, the limitations Dr. Smythe did note when answering the

20  questionaire provided by plaintiff's counsel appear to have been attributed at least in part to sleep apnea.

21  Tr. 249-51.  Because, as discussed above, the ALJ erred in evaluating the findings and opinions provided

22  by Dr. Smythe on that questionaire, it is unclear the ALJ accurately accounted for all limitations stemming

23  from this condition.  The same is not true, however, with respect to plaintiff's alleged depression.  She has

24  pointed to no evidence in the record of specific work-related limitations that have been caused thereby, nor

25  does the undersigned's own review of the record reveal any.

26      In addition, plaintiff argues the ALJ's assessment of her residual functional capacity is erroneous,

27  because he improperly rejected the limitations identified by Ms. Bell, Dr. Burke and Dr. Smythe.  With

28  respect to Dr. Smythe, as discussed above, the ALJ did err in evaluating the medical evidence provided by

1   him.  Thus, along with the questions regarding the impact of plaintiff's sleep apnea touched on by him in

2   the questionaire he completed, it is also unclear the ALJ properly considered the other limitations he noted

3   therein in assessing her residual functional capacity.  In regard to the limitations identified by Ms. Bell and

4   Dr. Burke, on the other hand, also as discussed above, the ALJ did not err in rejecting their findings and

5   opinions, and therefore the ALJ did not err here on that basis.

6   IV.   The ALJ's Step Five Analysis

7          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

8   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

9   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).  The

10  ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's

11  Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240

12  F.3d 1157, 1162 (9th Cir. 2000).

13         An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

14  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

15  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

16  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

17  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

18  by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

19  that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

20  Cir. 2001).

21         At the hearing, the ALJ posed a hypothetical question to the vocational expert which contained

22  limitations substantially similar to those included in the RFC assessment. Tr. 275-76.  In response to that

23  hypothetical question, the vocational expert testified that an individual described therein would be capable

24  of performing the jobs of medical receptionist and appointment clerk. Tr. 277.  The vocational expert went

25  on to testify further in relevant part as follows:

26         . . . Figures on that are about 12,700 [jobs] regionally and just about 1,100,000 [jobs]
           nationally.  That set of data includes . . . the DOT [Dictionary of Occupational Titles]
27         numbers for receptionist as well as medical receptionist and it also includes the data for
           appointment clerk, which is the second job I mentioned . . . So the numbers would be
28         the same.  I unfortunately can't give you an accurate breakdown of how many jobs per
           job title.  There are a total of 14 occupations in that group of data, the statistical

REPORT AND RECOMMENDATION
Page - 19

1    numbers that I've given you.  All related occupations.

2    Id.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other

3    jobs existing in significant numbers in the national economy. Tr. 31-32.

4         Plaintiff argues, however, that the vocational expert's failure to identify the specific number of jobs

5    for the two occupations of medical receptionist and appointment clerk, precludes the ALJ from relying on

6    the vocational expert's testimony to find her capable of performing other work at step five of the

7    sequential disability evaluation process.  The undersigned agrees.  While it certainly is true as the ALJ

8    noted that the vocational expert identified a group of "related occupations" encompassing a large number

9    of jobs both in the region and nationally, of which the above two specific occupations were a part, there is

10   no indication as to what percentage of the total number of jobs comprise medical receptionist and

11   appointment clerk.  That is, it is impossible based on the record currently before the Court to determine

12   whether the Commissioner has met his step five burden with respect to the two occupations specifically

13   identified by the vocational expert that plaintiff could perform.

14        Plaintiff further argues that she should be found disabled at step five of the sequential disability

15   evaluation process, because the vocational expert testified as well that an individual would not be able to

16   sustain employment if he or she had to elevate her feet for two hours a day. See Tr. 278.  However, given,

17   as discussed above, that the ALJ properly discounted plaintiff's credibility and the medical evidence in the

18   record indicating plaintiff had to elevate her feet for a significant portion of the day, there is no support in

19   the record for such a limitation.  As such, the ALJ was not required to adopt it or include it either in his

20   assessment of plaintiff's RFC or in the hypothetical question he posed.  Nevertheless, for the previously-

21   noted reason, and for the other errors noted herein that the ALJ made, the undersigned finds that the step

22   five determination overall was improper.

23   V.    This Matter Should Be Remanded for Further Administrative Proceedings

24        The Court may remand this case "either for additional evidence and findings or to award benefits."

25   Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

26   except in rare circumstances, is to remand to the agency for additional investigation or explanation."

27   Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

28   which it is clear from the record that the claimant is unable to perform gainful employment in the national

economy," that "remand for an immediate award of benefits is appropriate." <u>Id.</u>

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain regarding the medical evidence in the record, plaintiff's residual functional capacity and her ability to perform other jobs existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

Plaintiff requests that should this matter be remanded, the Commissioner be directed to obtain a neurological examination to assess the possibility that she suffers from neuropathy.  The undersigned finds this request to be reasonable.  As discussed above, at the hearing, Dr. Rullman testified that plaintiff's pain was "clearly . . . far out of proportion to any edema that's been commented on in the record." Tr. 273.  Dr. Rullman then went on to testify as follows:

> . . . [I]f pain is the issue here, and if she cannot tell us that we awaken in the morning and the edema is almost totally gone at that moment and I have no pain, if she's unable to tell us that, then I think she needs neurologic referral for the implication of neuroconvection (Phonetic) studies can be done [sic].  Is it possible this is really a neuropathy rather than something related to swelling?

Tr. 273.  This issue apparently was not further explored by the ALJ or otherwise addressed in his decision, other than to note that there was no diagnosis of neuropathy in the record. <u>See</u> Tr. 29.  The testimony of Dr. Rullman, however, clearly raises the possibility that such a diagnosis may be appropriate. <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001) (ALJ has duty to fully and fairly develop record).  Thus, on remand, the Commissioner should seek from plaintiff the specific information noted above sought by Dr. Rullman, and, if unable to get it, obtain a neurological consultation to determine if there is neuropathy and its effect, if any, on plaintiff's ability to function.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 27, 2008**, as noted in the caption.

DATED this 29th day of May, 2008.


Karen L. Strombom
United States Magistrate Judge